## BODENHEIMER v. CONFEDERATE MEMORIAL ASS'N.

No. 3525.

Circuit Court of Appeals, Fourth Circuit.

Jan. 4, 1934.

508

the paintings and other exhibits there contained, she was invited by the superintendent of defendant to visit the buildings and grounds of the Confederate Soldiers' Home nearby, and that, as she was passing for this purpose over a concrete walkway on the defendant's property, she fell and was injured as a result of the defective condition of the walkway. There was an allegation that defendant was guilty of negligence in the selection of its agents, servants, and employees, but no allegation of facts showing any causal connection between such negligence and the condition of the walkway which caused plaintiff's injury. Defendant, in addition to pleading the general issue, filed a special plea to the effect that it was a charitable corporation and as such not liable in damages for the negligence charged. There was a traverse of the special plea; and, a jury trial being waived, all matters of law and fact arising thereon were submitted to the court.

The court found that the defendant was incorporated to erect and maintain a Confederate Memorial Institute, and there to collect, arrange, and preserve statutes, portraits, photographs, and historical data relating to the Southern Confederacy, "calculated to enable future historians to obtain such reliable facts and data as will assist them in writing fair, accurate and impartial history of said war and of the South, the said association being educational, patriotic and historical at all times." It was shown that all of the property of the defendant had been given to it by patriotic individuals and societies to accomplish the purposes for which it was incorporated. And with respect to the charging of fees for admission to "Battle Abbey," the building in Richmond in which its portraits and other historical data are housed, the court found the facts to be as follows: "From the testimony it clearly appears that the funds derived from admission fees are scarcely sufficient to pay the necessary expenses of keeping 'Battle Abbey' open for the benefit of historians, students and the general public; that there has never been any profit from the operations of the association, and even if there were profits therefrom the trustees, under the terms of the charter, would be required to expend such profit in the acquisition of additional historical data; that defendant is a non-stock corporation, and the sole purpose for which the institution is maintained is to make available for historians, students and the public generally valuable Confederate historical documents, portraits, paintings and the like, which purpose is wholly public in its nature; and that the only paid employees of the associa-

Robert H. McNeill, of Washington, D. C. (McNeill & McNeill, of Washington, D. C., and Elledge & Wells and J. M. Wells, Jr., all of Winston-Salem, N. C., on the brief), for appellant.

Robert G. Butcher, of Richmond, Va. (Parrish & Butcher, of Richmond, Va., on the brief), for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal in an action instituted by a citizen of North Carolina against the Confederate Memorial Association, a corporation created under the laws of Mississippi, to recover damages on account of personal injuries alleged to have been sustained as a result of the defective condition of a cement walk on defendant's premises. The declaration alleged that, after plaintiff had visited "Battle Abbey," a building maintained by defendant in Richmond, Va., and had paid the usual admission fee and viewed

tion are a hostess, a superintendent of buildings and grounds, and an assistant to such superintendent. It further appears from the testimony that the total income for the year was $4,665.00, $2,565.00 of which was derived as income from endowments and from other sums donated for the purpose of furthering the objects of the association, that the remaining $2,100.00 was derived from gate receipts or fees, and that the association ever since its organization has been, and still is, dependent upon the voluntary contributions and services of its members and friends for the continuance of its existence and activities."

On these facts, the defendant was held to be an eleemosynary or charitable institution and the plaintiff a beneficiary of the charity. The special plea was, therefore, sustained, and judgment entered thereon for defendant. From this judgment plaintiff has appealed.

■ The decision of the lower court was unquestionably correct. In Ettlinger v. Trustees of Randolph Macon College (C. C. A. 4th) 31 F.(2d) 869, we went fully into the question here involved, and there is no need to repeat what was said in that case as to the basis or application of the doctrine exempting eleemosynary institutions from liability for torts. We there held: (1) That, on grounds of public policy, those who accept the benefits of an eleemosynary institution are precluded from recovering damages of it on account of the negligence of its agents and servants; (2) that, if the institution is in fact a charitable one conducted for the benefit of humanity and not for profit, its exemption from liability for the torts of its agents and servants is not affected by the fact that it may have made a charge to the injured person for the service rendered; (3) that there is no distinction, with respect to this exemption from liability, between the negligence of the managers and directors of the institution and that of its minor employees; and (4) that, as affects this exemption, it makes no difference that the negligence relied on relates to the condition of the premises maintained by the charity.

Plaintiff attempts to distinguish the case at bar from the Ettlinger Case on the ground that, at the time of her injury, she had completed her visit to "Battle Abbey" and was on her way to visit the Soldiers' Home adjoining. It is argued that she had thus ceased to be a beneficiary of the charity and was no more than a mere invitee on its premises, and as such entitled to invoke the rule which imposes liability on charitable corporations for injuries to strangers to the charity, laid down by such cases as Hospital of St. Vincent of

Paul v. Thompson, 116 Va. 101, 81 S. E. 13, 51 L. R. A. (N. S.) 1025. But without deciding whether we would follow the "liability to strangers" doctrine if it were applicable here, we are clearly of opinion that it is not applicable. Plaintiff became a beneficiary of the charity of the defendant when she entered upon its premises for the purpose of viewing the paintings and other exhibits which it had collected. She certainly did not lose the character of a beneficiary until she had left the premises upon which she had entered for that purpose. That she was leaving by one walkway rather than by another, or that she was going to an adjoining institution rather than to the street, cannot alter the fact that her presence upon defendant's premises was as a beneficiary of the institution which it maintained.

■ It is argued that the fact that defendant is a charitable corporation does not exempt it from negligence in the selection of incompetent servants; and reliance is placed upon certain expressions contained in the case of Weston's Adm'x v. Hospital of St. Vincent of Paul, 131 Va. 587, 107 S. E. 785, 23 A. L. R. 907. As pointed out by the judge below, however, there is nothing in the declaration which shows how this alleged negligence could have caused plaintiff's injury. And aside from this, we do not think that the rule applicable to eleemosynary institutions imposes liability upon the defendant for negligence of its managers and directors in the selection of its employees. As pointed out in the Ettlinger Case, supra, the rule relied on by plaintiff is the one properly applicable in the case of ordinary private corporations who employ physicians and surgeons to treat their injured employees, but logically has no application to an eleemosynary institution. As said by Chief Justice Rugg of Massachusetts in Roosen v. Peter Bent Brigham Hospital, 235 Mass. 66, 126 N. E. 392, 394, 14 A. L. R. 563, and quoted by us with approval in the Ettlinger Case: "There is no sound distinction in reason between the liability of a hospital for the negligence of its inferior agents and its liability for the carelessness of its managers. The conduct of both relates to the execution of the charity. The inferior agents usually work for pay, while the managing officers as matter of common knowledge generally undertake the administration of the public charity without compensation, solely out of public spirit in a desire to serve the general welfare. If the hospital is held responsible for their acts of negligence, the funds devoted to the relief of suffering humanity must be diverted in the one instance

to the same extent and manner as in the other to the payment of claims wholly foreign to the purposes of the public trust."

And we do not understand that the Weston Case establishes a different rule for the Virginia courts. That case decided nothing more than that a charitable corporation was not liable for the negligence of its minor employees. The negligence of its managers and directors was in no way involved, and what was said with regard thereto was not at all necessary to the decision. Even if we were bound by the Virginia decisions in a case of this character, we would follow our own decisions as laying down the applicable law, in the absence of a Virginia decision deciding the exact question to the contrary. 25 C. J. 841, § 175; Carroll v. Lessee of Carroll, 16 How. 275, 286, 287, 14 L. Ed. 936; In re Sullivan (C. C. A. 8th) 148 F. 815, 817; Southern R. Co. v. Simpson (C. C. A. 6th) 131 F. 705, 709.

As there is no conflict between the Virginia decisions and our own decisions with reference to the principles of law governing the case before us, it is not necessary to decide to what extent we are bound to follow the Virginia decisions—whether as strong persuasive authority under the principles of comity, or as binding authority under the rule governing in case of local statutes and property rights. It is hard to see, however, on what principle local decisions should have any greater binding force in cases of this character than they would have in other cases involving liability for negligence, as to which see Chicago City v. Robbins, 2 Black, 418, 428, 17 L. Ed. 298; Baltimore & O. R. Co. v. Baugh, 149 U. S. 368, 374, 13 S. Ct. 914, 37 L. Ed. 772, and Hewlett v. Schadel (C. C. A. 4th) 68 F.(2d) 502 (this day decided). Nor is it necessary to decide, and we do not decide, what is the rule as to the liability of a charitable corporation for injuries inflicted upon one not a beneficiary of the charity in the administration of property used exclusively for charitable purposes, and not held by the charity as an investment. The weight of authority seems to sustain liability in such cases; but a more profound analysis of underlying principles may disclose that there is no reason for subjecting property which has been dedicated to purposes of the highest importance to humanity to liability, under the rule respondeat superior, for the negligence of those who administer it. While those guilty of negligence should undoubtedly be held to accountability therefor, it does not necessarily follow that property dedicated to the use of humanity should be subjected to loss because of the negligence of those who happen to control it. There would be something incongruous in the sale of a church, or a public library, or a public art gallery to satisfy the claim of an individual for damages sustained as a result of the negligence of the trustees in failing to keep the property in repair. As was well said by the learned judge below: "In this connection it may not be amiss to point out what would very probably occur in this case were plaintiff permitted to maintain her action for damages and to obtain a verdict and judgment against defendant. Such verdict and judgment would probably be substantial. The judgment could be paid only from donations heretofore or hereafter made by friends of the institution. If it were not paid execution would in due course issue. If the execution were not satisfied through the institution it would become necessary for the Marshal to levy upon the invaluable historical material which defendant has collected and is preserving in Battle Abbey solely for the benefit of this and future generations. This historical material, or a great part of it, would have to be sold at public auction to satisfy the execution. The institution would probably be disrupted with the result that no doubt it would be impossible ever again to assemble such an extensive and valuable collection of historical data, so that the loss to the public would be irreparable."

For the reasons stated, we think that the judgment appealed from was correct, and same will accordingly be affirmed.

Affirmed.